UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

                                                        :
                                                        :
FERMION CAPITAL MANAGEMENT AG,          :        Case No. 25-cv-4026
CALTENN INC., and ARX ACCURATE RX       :
SPECIALTY PHARMACY CORP.,               :
                                                        :
                                                        :
                                                        :        **COMPLAINT**
                        Plaintiffs,                     :
                                                        :        **PLAINTIFFS**
        - against -                                     :        **DEMAND**
                                                        :        <u>**TRIAL BY JURY**</u>
                                                        :
PLANET PROJECT SOLUTIONS LLC, THE LAW   :
OFFICE OF DEAN MASTRANGELO, P.C., DEAN  :
MASTRANGELO, JOSEPH BARISIC, a/k/a JOSEPH :
BARISICH, MARTIN THOMAS DAVIES, BERNHARD :
OCHS, and RELIEF DEFENDANT BETTY LOU    :
HOLLAND STORASKA AND/OR JANE DOE, SOLELY :
AS PERSONAL REPRESENTATIVE OF THE ESTATE :
OF JOHN FREDERIC STORASKA,              :
                                                        :
                                                        :
                        Defendants.                     :
-----------------------------------------------------------------------X

        Fermion Capital Management AG ("Fermion"),  Caltenn Inc. ("Caltenn"), and ARX

Accurate RX Specialty Pharmacy Corp. ("ARX"), by their undersigned attorneys, Golenbock

Eiseman Assor Bell & Peskoe LLP, for their Complaint against defendants Planet Project Solutions

LLC ("PPS"), The Law Office of Dean Mastrangelo, P.C., Dean Mastrangelo, Joseph Barisic, a/k/a

Joseph Barisich, Martin Thomas Davies, and Bernhard Ochs (each a "Defendant" and collectively,

"Defendants"), and against relief defendant Betty Lou Holland Storaska and/or Jane Doe, solely as

personal representative of the Estate of John Frederic Storaska ("Relief Defendant"), respectfully

allege with particularity:

## I.     NATURE OF THE ACTION

1.      This action arises from a fraudulent investment scheme conducted by the Defendants and other co-conspirators known and unknown, who aided and abetted each other and conspired to engage in, and did engage in, racketeering activity consisting of wire fraud, bank fraud, and money laundering, with the intent to defraud, steal, and convert to their own use no less than $2,000,000 from each of the Plaintiffs and others, and to conceal this unlawful conduct from Plaintiffs by fraudulent representations and other acts, all in violation of 18 U.S.C. §§1961 and 1962 (hereinafter the "Racketeering Scheme").  Plaintiffs seek damages, punitive damages, treble damages, and attorney's fees and costs against the Defendants for their intentional and knowing participation in the Racketeering Scheme and for aiding and abetting the theft of this money from Plaintiffs, and against Relief Defendant solely for the conduct of co-conspirator John Frederic Storaska ("Storaska"), deceased.  All references herein to acts performed by Defendants do not include Relief Defendant Betty Lou Holland Storaska and/or Jane Doe, personal representative of the Estate of John Frederic Storaska, in their personal capacity but solely as the personal representative, and recovery is sought against Relief Defendant solely from the assets of the Estate of John Frederic Storaska.

2.      Each Plaintiff was fraudulently induced to enter into almost identical deed of agreement contracts ("DOA") with Defendant Planet Project Solutions LLC, which operated in New York and Florida and was owned and controlled by Storaska.

3.      To induce each Plaintiff and other potential victims to enter into a DOA, Storaska promised each Plaintiff and other potential victims that its invested funds would be held in the IOLTA registered trust account of the trustee of PPS, identified as Defendant The Law Office of Dean Mastrangelo, P.C., operated and controlled by Defendant Dean Mastrangelo, a New York attorney, which account was at JP Morgan Chase, New York, New York, Southern District of New York ("Mastrangelo IOLTA Account"), and that PPS would then transfer those funds into a trust

fund to be opened exclusively for and on behalf of the Plaintiff or victim or its nominee and used exclusively on behalf of the Plaintiff or victim for trade programs run by PPS.

4.      Each DOA into which a Plaintiff was induced to enter stipulated that each Plaintiff transfer $2,000,000 to an IOLTA registered trust account of the trustee of PPS, identified as The Law Office of Dean Mastrangelo, P.C., operated and controlled by Dean Mastrangelo, which account was at JP Morgan Chase, New York, New York, Southern District of New York.  Each DOA further promised that PPS would transfer each $2,000,000 to a trust fund to be used exclusively for the benefit of the respective Plaintiff, i.e., it promised to "open a new tax natural offshore trust as an investment vehicle for and on behalf of [Plaintiff] or its nominee" (the "Trust") to be "exclusively utilized on behalf of [Plaintiff] for trade programs by [PPS], into which all proceeds from [the trading programs] will be deposited" to use as seed money to raise over $100 million for each Investor.

5.      Each DOA also promised to provide the Plaintiff security in the form of a quality bank guarantee and to provide weekly bank statements.

6.      Each DOA was materially identical to the DOA PPS entered with the other Plaintiffs, and which PPS proposed to other victims, in all but minor respects.

7.      Periodically, after each Plaintiff entered a DOA and deposited its funds, in order to further and conceal the Racketeering Scheme, Defendants and co-conspirators sought to persuade and lull Plaintiffs and other victims into (i) believing the investment scheme was successful as promised, and (ii) not taking any other action, by regularly providing Plaintiffs and other victims false emails reporting that their funds had grown by a specific amount in the millions and tens of millions of dollars toward the promised $100 million.

8.    Unknown to each Plaintiff and other victims, Defendants and co-conspirators never intended to transfer and never did transfer the funds received to a trust for the benefit of the Plaintiff or victim, as was PPS's duty under the contractual agreements with each party, and never provided a bank guarantee or the weekly bank statement.  Instead, Defendants and co-conspirators either (i) kept all funds, or (ii) spent or used those funds for the benefit of one or more of them.

9.    In addition, PPS threatened one or more Plaintiffs that if it continued to ask questions about the arrangement or contacted a lawyer to inquire about the matter, PPS would cancel the agreement and return the original investment.

10.    Defendants and co-conspirators transferred no less than $5,000,000 of the Plaintiffs' funds from the aforementioned account of Mastrangelo to a bank account in Germany in the name of Solaris SE, under the control of a German lawyer ("Attorney 1"), acting for Defendant Ochs, which was an offshore account that was not designated as an escrow or trust account in favor of the Plaintiff, as required by the DOA.  The Plaintiffs never approved or agreed to the transfer of any funds to Attorney 1.  The balance of the $6,000,000 was used by one or more Defendants or is unaccounted for.

11.    Defendants, co-conspirators and Attorney 1 have not returned any of the funds to the Plaintiffs, and Attorney 1 and Ochs have aided and abetted the other Defendants and co-conspirators by refusing to produce information to the Plaintiffs.

12.    Defendants and co-conspirators concealed all of the foregoing from the Plaintiffs.

13.    The Plaintiffs only learned these facts and the true location of their funds as a result of obtaining bank and other records as a result of subpoenas issued pursuant to an order issued by the Supreme Court of the State of New York, New York County, in response to Plaintiff Fermion's Petition, Docket Number 654091/2023, dated September 6, 2023, which granted discovery to

Fermion for information from PPS, the representative of the Estate of John Storaska, Mastrangelo, and others.

14.    PPS also attempted to use the same Racketeering Scheme to defraud numerous additional victims using materially identical DOAs, but on information and belief, these potential victims did not actually transfer any funds to PPS.

## II.    PARTIES AND CO-CONSPIRATORS

### A.    PLAINTIFFS

15.    Plaintiff Fermion Capital Management AG ("Fermion") is a company organized under the laws of Switzerland, with its principal place of business in Geneva, Switzerland.  Mr. Dirk Coetzer is the founder and CEO of Fermion.

16.    Plaintiff Caltenn, Inc. ("Caltenn") is a company organized under the laws of Texas, with its principal place of business in Louisiana.  Mr. Bob Robards is a Managing Officer of Caltenn.

17.    Plaintiff ARX, Accurate RX Specialty Pharmacy Corp. ("ARX") is a company organized under the laws of Nevada with its principal place of business in New York.  Dr. Murray Friedman is a Managing Officer of ARX.

### B.    DEFENDANTS AND OTHER CO-CONSPIRATORS

18.    Co-conspirator Storaska , resided at 17700 Collins Avenue, Apt 705, Sunny Isles Beach, Florida, died on July 12, 2023.  On information and belief, Storaska died without a Will, and no personal representative has been appointed to his Estate.  On information and belief, Storaska was survived by his spouse, Betty Lou Holland Storaska.  Plaintiffs seek to appoint as the personal representative of the Estate of John Frederic Storaska either Betty Lou Holland Storaska, one of the Plaintiffs, or Jane Doe, another appropriate person, and Betty Lou Holland is joined as Relief Defendant solely for this purpose.  Storaska was the sole member of Defendant PPS and represented

to the Plaintiffs that he and PPS were doing business at 575 Underhill Blvd, Syosset, New York, and that PPS used an escrow account at JP Morgan Chase Bank, New York, New York and had property in New York. JP Morgan Chase Bank has its principal place of business at New York County, New York. The Estate of Storaska is liable to the Plaintiffs for the acts of Storaska set forth herein.

19.    Defendant PPS is a limited liability company organized under the laws of Wyoming, and on information and belief, Storaska was its only member. PPS held itself out as operating in New York and Florida.

20.    Defendant Dean Mastrangelo resides in either Nassau or Suffolk County, New York, and is a domiciliary of New York. He is the owner and operator of Defendant the Law Office of Dean Mastrangelo, P.C..

21.    Defendant the Law Office of Dean Mastrangelo, P.C., is a New York law firm organized under the laws of New York, doing business at an address in Syosset, New York, under the control of Defendant Mastrangelo.

22.    Defendant Joseph Barisic a/k/a Joseph Barisich resides in either Nassau or Suffolk County, New York. At all times relevant hereto, he has been an employee or agent of Law Office of Dean Mastrangelo, P.C., and a disbarred lawyer and convicted felon. Defendants held out Barisic as an attorney at Mastrangelo's firm.

23.    Defendant Martin Thomas Davies resides at an unknown address in London, England or Cyprus.

24.    Defendant Bernhard Ochs is a citizen of France, on information and belief doing business at Etzenroterstrasse 17 D-76337 Waldbronn, Germany.

25.    Attorney 1 is citizen of Germany and a licensed attorney in Germany. On information and belief, Attorney 1 was a co-conspirator in the Racketeering Scheme.

26.     Agent 1 resides in Florida and acted as manager and agent of Defendant PPS before and after Storaska's death.  Agent 1 also acted as agent for John Storaska before his death and as agent for Storaska's Estate after his death, and remains in control of the assets and books and records of PPS, John Storaska, and the Enterprise (defined hereafter).  Upon information and belief, after September 2023, Agent 1 continued to withhold information from Plaintiffs and to convey false information to Plaintiffs in order to further and conceal the Racketeering Scheme.

27.     Agent 2 is an LLC located in Sunny Isles Beach, Florida, controlled by Agent 1. Defendants and co-conspirators funneled money from the Racketeering Scheme through Agent 2 to pay co-conspirator Storaska.

### III.     JURISDICTION AND VENUE

28.     This Court has jurisdiction of this action pursuant to 18 U.S.C. §1964 and 1965 of the Racketeer Influenced and Corrupt Organizations Act, and 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over state law claims against the Defendants, pursuant to 28 U.S.C. § 1367, including over the appointment of a personal representative to administer the Estate of John Frederic Storaska.  N.Y. Constitution, Article VI, §§ 7, 12 and S.C.P.A. § 201.

29.     The amount in controversy exceeds $6 million exclusive of interest and costs.

30.     This Court has personal jurisdiction over each of the Defendants as one or more co-conspirators committed overt acts in furtherance of the Racketeering Scheme in the Southern District of New York and Storaska had property in and committed acts in New York and the Southern District of New York to further the Racketeering Scheme.

31.     This Court also has personal jurisdiction over Defendants The Law Office of Dean Mastrangelo, P.C., Dean Mastrangelo, and Joseph Barisic as they are domiciled in New York.

32.     This Court has personal jurisdiction over Defendant PPS and the other Defendants as they purposefully engaged New York-domiciled law firm The Law Office of Dean Mastrangelo, P.C. as their agent to facilitate the Racketeering Scheme.

33.     Venue is proper in the Southern District of New York pursuant to 18 U.S.C. §1965 , because it is a district in which the Defendants transact business and which certain members of the association-in-fact enterprise alleged below transact business, and pursuant to 28 U.S.C. § 1391(b), (c) and (d) as the place in which a substantial part of the events giving rise to this claim occurred.

## IV.     AGENCY ALLEGATIONS

34.     At all times relevant hereto, Defendants PPS, Dean Mastrangelo, Joseph Barisic, Bernhard Ochs and Martin Thomas Davies conspired, collaborated, and colluded with, aided and abetted, and conspired with each other and with co-conspirator Storaska, other co-conspirators, including Attorney 1 and Agents 1 and 2 to further the Racketeering Scheme.  In that capacity each (a) was acting as the agent, servant, representative, partner, co-conspirator, joint venturer, employee, instrumentality, and co-schemer of each other and of the wrongdoers named herein, and, in committing the wrongful acts and omissions described herein, acted in concert with each other and within the course, scope, knowledge and purpose of that agency, representation, partnership, joint venture, employment, instrumentality, conspiracy or scheme; (b) authorized or ratified the acts of each other in furtherance of the Racketeering Conspiracy to steal and launder the money of the Plaintiffs and others and to conceal the Racketeering Scheme; and (c) had knowledge of, agreed and intended to participate in, did knowingly participate in, the  events, acts, transactions, practices and courses of conduct described herein, and, in committing and permitting said acts and omissions, did cause, aid, abet, facilitate, encourage, authorize, consent, approve, permit, adopt and/or ratify the wrongful acts and omissions of the others, conspired, schemed, collaborated, and colluded with each

other, and upon information and belief others, to join, further, and conceal the Racketeering Scheme..

35. Each of the acts of co-conspirator Storaska set forth herein was conducted on behalf of Defendant PPS, and John Frederic Storaska operated and controlled PPS at all material times.

## V.    FACTUAL ALLEGATIONS

36. In furtherance of the Racketeering Scheme, the Defendants and co-conspirators used the following means and engaged in the following overt acts, among others.

### A.    FERMION

37. In or around October 2022, broker no. 1 introduced Fermion's Chief Executive Officer to Storaska.

38. To induce Fermion to enter into a deed of agreement, Storaska, with the intent to deceive and defraud, promised Fermion in substance that its invested funds would be held in the IOLTA registered trust account of the trustee of PPS, identified as The Law Office of Dean Mastrangelo, P.C., operated and controlled by Mastrangelo, with the account at JP Morgan Chase, New York, New York ("Mastrangelo IOLTA Account"), and that PPS would transfer Fermion's funds to a trust fund to be opened for an on behalf of the Investor or its nominee and used exclusively on behalf of the Investor for trading programs by PPS <u>and</u> into which trust account all proceeds from the trading programs would  be deposited to use as seed money to raise over $100 million for Fermion.

39. Storaska also promised Fermion that PPS would provide Fermion security for its investment in the form of a bank guarantee by a top quality bank and would provide weekly bank statements.

40. On or about November 3, 2022, in reasonable reliance on Storaska's representations, Fermion entered a written deed of agreement with PPS, by its president Storaska (the "Fermion

DOA"). The Fermion DOA contained in substance the promises that Storaska had made to Fermion. The Fermion DOA was materially identical to the DOAs PPS entered with the other Plaintiffs in almost all respects, with some minor variations. Each of the Defendants and Storaska knew of the substance of the representations in the Plaintiffs' DOAs with PPS.

41.     The Fermion DOA provided that:

a.     Fermion's $2 million deposit would be deposited into the "IOLTA registered escrow trust bank account" of PPS's Escrow Agent at JP Morgan Chase Bank. On page 20, the DOA provided the bank details for the IOLTA account of The Law Office of Dean Mastrangelo, PC, located in Syosset, New York. Clause 1.4;

b.     PPS would engage in "Program 1" to use the $2 million as seed money to grow Fermion's investment to $100 million. Fermion DOA Clause 2.0. The DOA further provided that when the "clean, clear and available cash minimum" in the trust fund bank account reached $100 million, PPS would enter the trust into a "10 month buy-sell trade Program 2, producing an income of ROI over the 10 month period equal to NET 100% ROI payable per month to [Fermion] as 'The Trust' beneficiary, through [Fermion's] tax natural trust account, to a guaranteed NET minimum available total of $1 billion USD." Clauses 2.0, 2.4.

c.     PPS would "open a new tax natural offshore trust as investment vehclie [sic] for and on behalf of [Fermion] or its nominee" (the "Trust"), "at their cost" which "shall be exclusively utilized on behalf of [Fermion] for trade programs by [PPS] into which all proceeds from Program 1 and Program 2

will be deposited into."  Clause 1.5 of the Fermion DOA further provided that Fermion's funds "shall remain on the escrow account until the Program 1 begins . . . ".  Clause 1.5

d.    Within three banking days of receipt of cleared funds from Fermion, PPS was also required to provide a bank guarantee issued by a "top quality bank" in the amount of $3 million and valid for 90 days as security. Clause 1.6;

e.    Program 1 "is for the purchase and monetization and/or sale of bank instruments through as few as possible selected investment grade iterations to reach as quickly as possible from the first purchase and sale, the ROI sum … being the target sum in cash ROI of a minimum of $100M USD (One Hundred Million United States Dollars) or better, in the singular offshore tax neutral [sic] trust that [PPS] created on behalf of [Fermion] at the beginning of Program 1 for this sole purpose. To start with Two Million United States Dollars ($2,000,000); to reach the target goal of $100 Million USD with all speed, in approximately 32 (Thirty Two) banking days."  Clause 2.0;

42.    Clause 2.1.a states that Fermion agreed "to supply investment of Two Million United States Dollars ($2,000,000) and hence one (1) trust fund shall be created separately for Program 1 to run said Trust Fund with allocated starting funds of $2M USD within their programs."  Clause 2.1.b states that "[d]uring the first iteration of buy-sell, [PPS] shall add a sum equal to the investment of [Fermion] to the program whose profit shall benefit [Fermion] under the terms of [the DOA]."

43.    Pursuant to clause 2.2 of the Fermion DOA, PPS was also required to "report every Friday by sending a bank statement via email to [Fermion] of this contracted performance, until the minimum sum of $100 million USD (or more) NET has been reached in cash in account."  Clause

11

2.2 of the Fermion DOA also stated that neither Fermion nor PPS could draw down profit or capital investment during Program 1 until the $100 million was raised, but thereafter each party could request partial drawdown of the profits created.

44.    On or about November 7, 2022, as required by the Fermion DOA, Fermion transferred $2 million to PPS to commence "Program 1."

45.    Fermion and PPS never entered into the Irrevocable Master Fee Protection Agreement (IMFPA) referred to in the Fermion DOA.

46.    PPS never provided Fermion with a bank guarantee, access to additional funds, used a trust account for the exclusive benefit of Fermion, engaged in any trading program, provided bank statements, or provided accurate statements of the funds in Fermion's Program 1.

47.    The Fermion DOA also stated that the information contained in the Fermion DOA shall be kept strictly confidential.

## B.    CALTENN

48.    In or around October 2022, broker no. 1 introduced Caltenn's Managing Officer to Storaska.

49.    To induce Caltenn to enter into a deed of agreement, Storaska, with the intent to deceive and defraud, made similar promises and representations to Caltenn that he made to Fermion as set forth in paragraphs 38 and 39 above.

50.    On or about January 6, 2023, Caltenn entered a written deed of agreement with PPS, by its president Storaska (the "Caltenn DOA").  The Caltenn DOA was materially identical to the DOAs PPS entered with the other Plaintiffs in almost all respects, with some minor variations, including that the Caltenn DOA also provided that Caltenn's funds would be locked in the Mastrangelo IOLTA Account for 90 days.

51.     On or about January 6, 2023, as required by the terms of the Caltenn DOA, Caltenn transferred $2 million to PPS to commence "Program 1."

52.     Caltenn and PPS never entered into the Irrevocable Master Fee Protection Agreement (IMFPA) referred to in the Caltenn DOA.

53.     PPS never provided Caltenn a bank guarantee, access to additional funds, used a trust account for the exclusive benefit of Caltenn, engaged in any trading program, provided bank statements, or provided accurate statements of the funds in Caltenn's Program 1, and Caltenn's funds were not locked in the Mastrangelo IOLTA Account for 90 days.

**C.      ARX**

54.     In or around October 2022, broker no. 1 introduced ARX's Managing Officer to Storaska.

55.     To induce ARX to enter into a deed of agreement, Storaska, with the intent to deceive and defraud, made similar promises and representations to ARX that he made to Fermion as set forth in paragraphs 38 and 39 above.

56.     On or about January 18, 2024, Storaksa also stated to ARX that "this contract is especially designed to be not only very clear but transparent and to be signed as is," and that "as of this January 16th PPS traders have ended the 2M program and replaced it with a 3.5M minimum." Storaska stated that "however … we will accept your 2M offer provided you execute the attached contract and return to me whereupon I will countersign it & return to you ... then you need to wire your 2M to our esrowed [sic] IOLTA trust at Chase NY by this Friday January 20th."

57.     On or about January 20, 2023, ARX entered a written deed of agreement with PPS, by Storaska (the "ARX DOA").  The ARX DOA was materially identical to the DOAs PPS entered with the other Plaintiffs in almost all respects, with some minor variations, including that the ARX

DOA also provided that ARX's funds would be locked in the Mastrangelo IOLTA Account for 90 days.

58.     On or about January 20, 2023, as required by the ARX DOA, ARX transferred $2 million to PPS to commence "Program 1."

59.     ARX and PPS never entered into the Irrevocable Master Fee Protection Agreement (IMFPA) referred to in the ARX DOA.

60.     PPS never provided ARX a bank guarantee, access to additional funds, used a trust account for the exclusive benefit of ARX, engaged in any trading program, provided bank statements, or provided accurate statements of the funds in ARX's Program 1, and ARX's funds were not locked in the Mastrangelo IOLTA Account for 90 days.

## D.     OTHER VICTIMS

61.     As part of the Racketeering Scheme, Defendants, Storaska, and other co-conspirators attempted to defraud other victims, known and unknown to Plaintiffs, and in some cases were successful.

62.     In or around October 2022, broker no. 1 introduced Victim 1's chief executive to Storaska at PPS.  Victim 1 is a business operating in Illinois.

63.     To induce Victim 1 to enter into a deed of agreement, Storaska, with the intent to deceive and defraud, made similar promises and representations to Victim 1 that he made to Fermion as set forth in paragraphs 38 and 39 above.

64.     On or about November 18, 2022, Victim 1 entered a written deed of agreement with PPS, by its president Storaska (the "Victim 1 DOA").  The Victim 1 DOA was materially identical to the DOAs PPS entered with the Plaintiffs in almost all respects, with some minor variations.

65.     On or about November 22, 2022, as required by the Victim 1 DOA, Victim 1 transferred $2 million to PPS to commence "Program 1."

66.     Victim 1 and PPS never entered into the Irrevocable Master Fee Protection Agreement (IMFPA) referred to in the Victim 1 DOA.

67.     PPS never provided Victim 1 a bank guarantee, access to additional funds used a trust account for the exclusive benefit of Victim 1, engaged in any trading program, provided bank statements, or provided accurate statements of the funds in Victim 1's Program 1.

**E.     THE CO-CONSPIRATORS MISAPPROPRIATE THE INVESTMENT FUNDS AND CONCEAL THEIR MISCONDUCT.**

68.     Unknown to Plaintiffs, and contrary to the terms of the DOAs, PPS never put Plaintiffs' investment funds into a trust on their behalf or otherwise dedicated the investment funds to or for the Plaintiffs.  Instead,  the Defendants, Storaska, and other co-conspirators transferred the money from the Mastrangelo IOLTA Account at JP Morgan Chase, New York, New York to themselves or to various entities and persons affiliated with PPS in the United States and overseas.

69.     Each of the Defendants and Storaska knew the material terms of the DOAs, including that they required that PPS place Plaintiffs' funds into a trust, respectively, for the exclusive benefit of each Plaintiff.

70.     The promises and representations made by Storaska and in the DOAs were willfully and intentionally false, fraudulent, and misleading, as the Defendants knew.

**1.     STORASKA AND PPS**

71.     Each of the acts of Storaska set forth herein was performed on behalf of Defendant Planet Project Solutions LLC, and Storaska operated and controlled PPS as its sole member at all material times.

72.     Storaska took the following overt acts in furtherance of the Racketeering Scheme, among others.

73.     On or about June 15, 2022, Storaska entered into a Paymaster Service Agreement with Mastrangelo and The Law Office of Dean Mastrangelo, PC, pursuant to which PPS agreed to send funds to the Mastrangelo IOLTA Account and Mastrangelo agreed to transfer those funds from this IOLTA account in accordance with specific written instructions from PPS or others.

74.     On numerous occasions, Storaska represented to one or more Plaintiffs or led them to believe that Defendant Barisic was an attorney at Mastrangelo's law firm and was PPS's attorney, despite Mastrangelo knowing that Barisic was a convicted felon who had been disbarred from practicing law.  For example, on or about January 6, 2023, Storaska advised Caltenn that "I have my attorney [below] standing by for a CC Re your wire … Joseph Barisich JD, LLM, Law Office of Dean Mastrangelo, PC … ."

75.     On or about November 3, 2022, Storaska executed the Fermion DOA on behalf of PPS, which contained several misrepresentations as set forth above.

76.     On or about November 18, 2022, Storaska executed the Victim 1 DOA on behalf of PPS, which contained several misrepresentations as set forth above.

77.     On or about January 6, 2023, Storaska executed the Caltenn DOA on behalf of PPS, which contained several misrepresentations as set forth above.

78.     On or about January 20, 2023, Storaska executed the ARX DOA on behalf of PPS, which contained several misrepresentations as set forth above.

79.     Beginning in December 2022, Storaska sent regular weekly email reports by interstate wire communications to Plaintiffs falsely representing that certain amounts had been raised for the respective Plaintiffs to meet the goal of raising $100 million for each Program 1.   The purpose of these reports was to further and to conceal the conspiracy by lulling Plaintiffs into believing that PPS

was fulfilling its promises under the DOAs, and that the trading program was ongoing, so that Plaintiffs would not take any action.

80.    For example, following instructions by email from Davies, Storaska made the following reports, among others, to Fermion via email advising that the following funds had been raised on Fermion's behalf as of that date, each of which report was completely false:

(a)    On or about December 21, 2022, Storaska reported that $18,219,000 had been raised;

(b)    On or about January 21, 2023, Storaska reported that $23,910,700 had been raised;

(c)    On or about January 28, 2023, Storaska reported that $27,814,300 had been raised;

(d)    On or about February 4, 2023, Storaska reported that $34,291,500 had been raised;

(e)    On or about February 10, 2023, Storaska reported that $39,147,000 had been raised;

(f)    On or about February 25, 2023, Storaska reported that $56,918,400 had been raised;

(g)    On or about March 7, 2023, Storaska reported that $64,810,000 had been raised;

(h)    On or about March 11, 2023, Storaska reported that $72,016,900 had been raised;

(i)    On or about April 11, 2023, Storaska reported that $72,016,900 had been raised;

(j)     On or about April 22, 2023, Storaska reported that $75,217,300 had been raised;

(k)     On or about April 29, 2023, Storaska reported that $77,824,600 had been raised;

(l)     On or about May 6, 2023, Storaska reported that $80,594,100 had been raised;

(m)     On or about May 15, 2023, Storaska reported that $83,047,500 had been raised;

(n)     On or about June 18, 2023, Storaska reported that $95,916,200 had been raised;

(o)     On or about June 25, 2023, Storaska reported that $97,461,300 had been raised.

(p)     On or about July 1, 2023, John Frederic Storaska informed Fermion that Program 1 had achieved its goal of raising $100 million, and that PPS would commence Program 2.

81.     Storaska reported to Caltenn via email that the following funds had been raised on Caltenn's behalf, each of which report was completely false:

(a)     On or about January 20, 2023, Storaska reported that $5,190,300 had been raised;

(b)     On or about January 27, 2023, Storaska reported that $8,743,500 had been raised;

(c)     On or about February 4, 2023, Storaska reported that $12,594,700 had been raised;

(d)     On or about February 10, 2023, Storaska reported that $15,186,500 had been raised;

(e)     On or about June 25, 2023, Storaska reported that $67,318,900 had been raised.

82.     Storaska reported to ARX via email that the following funds had been raised on ARX's behalf, each of which report was completely false:

(a)     On or about February 4, 2023, Storaska reported that $6,114,500 had been raised;

(b)     On or about February 10, 2023, Storaska reported that $9,615,400 had been raised;

(c)     On or about February 25, 2023, Storaska reported that $22,496,500 had been raised;

(d)     On or about March 18, 2023, Storaska reported that trading was suspended "for the moment to protect interests" "due to the current flux of confidence in International Banking;"

(e)     On or about April 1, 2023, Storaska reported that "we expect on Monday 3rd April to see the resolution of our business in a prediction of reasonable confidence" as "the Markets and Banks this week appear to have somewhat stabilized;"

(f)     On or about April 8, 2023, Storaska reported that $34,219,800 had been raised;

(g)     On or about April 15, 2023, Storaska reported that $36,039,700 had been raised;

(h)     On or about April 22, 2023, Storaska reported that $38,947,200 had been raised;

(i)     On or about April 28, 2023, Storaska reported that $41,073,500 had been raised;

(j)     On or about May 5, 2023, Storaska reported that $44,392,600 had been raised;

(k)     On or about May 14, 2023, Storaska reported that $47,861,200 had been raised;

(l)     On or about May 20, 2023, Storaska reported that $50,104,800 had been raised;

(m)    On or about May 28, 2023, Storaska reported that $54,016,300 had been raised;

(n)     On or about June 3, 2023, Storaska reported that $57,239,600  had been raised;

(o)     On or about June 10, 2023, Storaska reported that $60,471,300 had been raised;

(p)     On or about June 18, 2023, Storaska reported that $63,091,400 had been raised;

(q)     On or about June 25, 2023, Storaska reported that $65,971,700 had been raised.

83.     Storaska reported to Victim 1 via email that the following funds had been raised on Victim 1's behalf, each of which report was completely false:

(a)     On or about December 23, 2022, Storaska reported that $6,219,400 had been raised;

(b)     On or about January 20, 2023, Storaska reported that $8,470,000 had been raised;

(c)     On or about January 27, 2023, Storaska reported that $11,629,100 had been raised;

(d)     On or about February 4, 2023, Storaska reported that $16,183,200 had been raised;

(e)     On or about February 10, 2023, Storaska reported that $20,072,800 had been raised.

84.     Each of these reports and representations was made to further the Racketeering Scheme and to conceal it, and was false.  None of these funds were raised, which Davies and Storaska fully knew.

85.     On or about December 23, 2022, Storaska reported via email to Victim 1 that "'Ibsalon Trust' was formed in Nevis as the tax free vehicle that is used for your position."  On information and belief, no such trust was ever used for the benefit of Victim 1.

86.     On or around January 10, 2023, Storaska reported via email to Victim 1 that "the trade is proceeding as contractually detailed. The trust vehicle unique to our contract has been created and registered, in complete readiness to operate the Program 2.  Program 1 funds will transfer over to the Program 2 in due course as per our contract."  Storaska further attached a certificate of formation for the Ibsalon Trust and a certification of registration for Argantrim LLC, both Nevis entities.

87.    On or around January 17, 2023, when Victim 1 asked for further details of the Ibsalon Trust, including details of the beneficiaries of the Trust and the LLC, and a bank statement showing the current balance of funds held, Storaska responded via email that "we are unable to answer your questions as they broach our privacy of business."

88.    On information and belief, the Ibsalon Trust never had Victim 1 as the beneficiary, but instead was set up as having PPS as the beneficiary, which Storaska fully knew.  On information and belief, the Ibsalon Trust and Argantrim LLC never had a bank account set up, so no funds were ever held by either of those two entities, which Storaska fully knew.

89.    On or about December 14, 2022, Storaska settled the Levantian Embrolios Trust and Mast High Fish Nets LLC, both Nevis entities.  Storaska appointed himself as the protector of the trust and the sole beneficiary was PPS.  No bank account was set up for the trust or the LLC.

90.    On or about January 26, 2023, Fermion requested from Storaska via email "the details of the trust/off-shore SPV that was set up for [Fermion]."  On or about January 31, 2023, Barisic replied to Fermion, copying Storaska, and attached a copy of a certificate of formation for the Levantian Embrolios Trust and a certification of registration for Mast High Fish Nets LLC, saying "Gentlemen, Please see attached information as you requested."  Storaska fully knew at this time that the Levantian Embrolios Trust did not have Fermion as the beneficiary and had instead been set up to have PPS as the beneficiary.  Storaska further knew that no bank account had been set up for the Trust or the LLC, and no funds were being held by the Trust or the LLC.  On information and belief, this Trust and LLC were never used for the benefit of Fermion, and Storaska and the Defendants and other co-conspirators concealed this fact from Fermion.

91.    Storaska also promised to provide Plaintiffs as security a bank guarantee issued by a "top quality bank" in the amount of $3 million and valid for 90 days, and to provide weekly bank

statements. Storaska never put the money into a trust for Fermion's benefit, provided the bank guarantee, or the weekly bank statements. Instead, PPS threatened Fermion that if it if it continued to ask questions about the arrangement or contacted a lawyer to inquire about the matter, PPS would cancel the agreement and return the original investment to Fermion.

92.     On or about January 2023, Storaska forwarded to Fermion an email in which Barisic assured another investor of the operation of the Racketeering Scheme, as follows:

> …As stated in section 1.6 of the contract between you and our client, Planet Project Solutions, LLC. Upon receiving funds into the IOLTA account of our law firm, Planet Project Solutions, LLC then supplies us with their own funds up to an amount they deem sufficient to cover the cost of a bank guarantee or standby letter of credit to guarantee the amount of funds you have deposited. Those funds are secured and maintained in our IOLTA account for no less than 90 days. Should the business between PPS and yourself not go as planned, then the held funds are to be used to supply you with the bank instrument which when cashed out or monetized will reimburse you up to the amount of principal you have previously invested … Joseph Barisic JD, LLM, Law Office of Dean Mastrangelo, PC.

Storaska knew or should have known at the time he forwarded this email to Fermion that no funds had been provided by PPS to the Mastrangelo IOLTA Account and that no funds were being "secured and maintained" in the Mastrangelo IOLTA Account.

93.     Additionally, Storaska benefited from the Racketeering Scheme by receiving the benefit of the funds stolen from the Plaintiffs' funds by electronic wire transfers from the Mastrangelo IOLTA Account into the account of Agent 2, located in Sunny Isles Beach, Florida, among others, on information and belief in accordance with instructions from Davies to Barisic, totaling over $290,000, as follows:

(a)     On or about November 8, 2022, $10,000;

(b)     On or about November 14, 2022, $40,000 for "commission fees for John Frederic Storaska;"

(c)     On or about November 17, 2022, $20,000;

(d)    On or about November 23, 2022, $60,000 for "our investment into the planned company returns;"

(e)    On or about December 21, 2022, $10,000;

(f)    On or about January 12, 2023, $70,000 for "property deposit and inspection fees;"

(g)    On or about January 25, 2023, $50,000;

(h)    On or about February 27, 2023, $10,000;

(i)    On or about March 17, 2023, $10,000 for "expenses;"

(j)    On or about March 22, 2023, $10,000.

94.    Storaska, Davies, Barisic, and Mastrangelo knew at the time of these transfers that they were not in accordance with the promises to the Plaintiffs and the DOAs, which required all the funds provided by the Plaintiffs be transferred to a trust on behalf of that particular Plaintiff and then invested on their behalf and that no fees or commissions were payable unless they were in accordance with the IMFPA, to which there was never agreement, and fees were only to be disseminated upon Program payments in accordance with the DOA.

**2.    DAVIES**

95.    Although holding no official interest or title in PPS, Defendant Martin Thomas Davies furthered the Racketeering Scheme in numerous ways, including by:

(a)    Designing the Racketeering Scheme;

(b)    Giving instructions on behalf of PPS to PPS's escrow agent, Mastrangelo and the Law Office of Dean Mastrangelo, P.C., to disburse funds held by them; and

(c)     Instructing Storaska regarding the figures and information to provide to Plaintiffs in the false lulling communications concerning their investments as set forth above.

96.     In addition to those set forth above, Defendant Davies took the following overt acts in furtherance of the Racketeering Scheme, among others:

97.     In August and September 2022, Davies communicated with Barisic to design part of the Racketeering Scheme involving the issuance of a bank guarantee / standby letter of credit.

98.     Beginning around December 2022, Davies sent emails to Storaska stating that a certain amount had been raised for Plaintiffs and others as part of Program 1.  Davies reported to Storaska via email that the following funds had been raised on Fermion's behalf, among others, and in addition to those set forth above:

(a)     On or about February 25, 2023, Davies reported to Storaska that $47,816,900 had been raised as of February 17, 2023;

(b)     On or about March 3, 2023, Davies reported to Storaska that $60,338,700 had been raised as of March 3, 2023;

(c)     On or about May 26, 2023, Davies reported to Storaska that $85,610,200 had been raised as of May 19, 2023;

(d)     On or about May 26, 2023, Davies reported to Storaska that $88, 193,700 had been raised as of May 26, 2023;

(e)     On or about June 2, 2023, Davies reported to Storaska that $90,965,200 had been raised as of June 2, 2023;

(f)     On or about June 10, 2023, Davies reported to Storaska that $93,091,600 had been raised as of June 9, 2023;

99.    Davies reported to Storaska via email that the following funds had been raised on Caltenn's behalf, among others, and in addition to those set forth above:

(a)    On or about March 3, 2023, Davies reported to Storaska that $26,283,500 had been raised as of February 24, 2023;

(b)    On or about March 3, 2023, Davies reported to Storaska that $31,492,300 had been raised as of March 3, 2023;

(c)    On or about April 28, 2023, Davies reported to Storaska that $43,091,500 had been raised as of April 21, 2023;

(d)    On or about April 28, 2023, Davies reported to Storaska that $45,073,500 had been raised as of April 28, 2023;

(e)    On or about May 5, 2023, Davies reported to Storaska that $48,521,300 had been raised as of May 5, 2023;

(f)    On or about May 14, 2023, Davies reported to Storaska that $50,937,300 had been raised as of May 12, 2023;

(g)    On or about May 26, 2023, Davies reported to Storaska that $53,274,600 had been raised as of May 19, 2023;

(h)    On or about May 26, 2023, Davies reported to Storaska that $56,391,200 had been raised as of May 26, 2023;

(i)    On or about June 2, 2023, Davies reported to Storaska that $59,407,500 had been raised as of June 2, 2023;

(j)    On or about June 10, 2023, Davies reported to Storaska that $62,489,200 had been raised as of June 9, 2023;

(k)    On or about June 17, 2023, Davies reported to Storaska that $65,138,700 had been raised as of June 16, 2023.

100.    Davies reported to Storaska via email that the following funds had been raised on ARX's behalf, among others, and in addition to those set forth above:

(a)    On or about March 3, 2023, Davies reported to Storaska that $26,904,800 had been raised as of March 3, 2023.

101.    Davies reported to Storaska via email that the following funds had been raised on Victim 1's behalf, among others, and in addition to those set forth above:

(a)    On or about March 3, 2023, Davies reported to Storaska that $35,149,600 had been raised as of February 24, 2023;

(b)    On or about March 3, 2023, Davies reported to Storaska that $40,617,200 had been raised as of March 3, 2023;

(c)    On or about April 28, 2023, Davies reported to Storaska that $53,726,700 had been raised as of April 21, 2023;

(d)    On or about April 28, 2023, Davies reported to Storaska that $56,162,300 had been raised as of April 28, 2023;

(e)    On or about May 5, 2023, Davies reported to Storaska that $59,018,500 had been raised as of May 5, 2023;

(f)    On or about May 14, 2023, Davies reported to Storaska that $61,501,700 had been raised as of May 12, 2023;

(g)    On or about May 26, 2023, Davies reported to Storaska that $64,839,100 had been raised as of May 19, 2023;

     (h)     On or about May 26, 2023, Davies reported to Storaska that $67,512,400 had been raised as of May 26, 2023;

     (i)     On or about June 2, 2023, Davies reported to Storaska that $70,914,800 had been raised as of June 2, 2023;

     (j)     On or about June 10, 2023, Davies reported to Storaska that $73,162,700 had been raised as of June 9, 2023;

     (k)     On or about June 17, 2023, Davies reported to Storaska that $76,405,300 had been raised as of June 16, 2023;

     (l)     On or about June 25, 2023, Davies reported to Storaska that $79,246,200 had been raised as of June 24, 2023.

102.    Each of these reports and representations was made to further the Racketeering Scheme and was false.  None of these funds were raised, which Davies fully knew.

103.    Davies intended and knew that Storaska repeated this false information to Plaintiffs. Davies was blind copied on all of Storaska's emails to Plaintiffs providing these false figures.

104.    In violation of the DOAs, Davies instructed Barisic to make interstate or international wire transfer of funds in the following amounts out of the Mastrangelo IOLTA Account, among others, and in addition to those set forth above:

     (a)     On or about November 13, 2022, Davies instructed Barisic to transfer $12,740 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, to pay for set up costs of a trust and several offshore LLCs for PPS;

(b)     On or about November 13, 2022, Davies instructed Barisic to transfer $9,800 from Mastrangelo's IOLTA Account to Davies' bank account at Hellenic Bank in Nicosia, Cyprus, (henceforth, "Davies' Cyprus Account") for "consultancy expenses;"

(c)     On or about November 14, 2022, Davies instructed Barisic to transfer $1,600,000 from Mastrangelo's IOLTA Account to Goldex Trading HK Limited Company's ("Goldex") bank account at Bank of America in Edina, Minnesota.  On information and belief, Goldex is a company formed in Wyoming, with a mailing address and registered agent in Dubai, and is an affiliate of the Co-Schemers;

(d)     On or about November 17, 2022, Davies instructed Barisic to transfer $4,540 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, to pay for the creation of a new offshore trust;

(e)     On or about November 18, 2022, Davies instructed Barisic to transfer $3,400 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, to pay for travel expenses and related disbursements for Barisic's trip to St. Kitts and Nevis;

(f)     On or about November 21, 2022, Davies instructed Barisic to transfer $150,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk,

New York, as Barisic was "helping [Davies] with the purchase of land … in Cyprus;

(g) On or about December 22, 2022, Davies instructed Barisic to transfer $25,000 from Mastrangelo's IOLTA Account to David Wright via the African American Federation for a "loan repayment;"

(h) On or about December 27, 2022, Davies instructed Barisic to transfer $6,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, for "work disbursements;"

(i) On or about January 6, 2023, Davies instructed Barisic to transfer $10,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, for "January fees/PPS account;"

(j) On or about January 10, 2023, Davies instructed Barisic to transfer $8,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, for "new offshore trust work;"

(k) On or about January 12, 2023, Davies instructed Barisic to transfer $1,100,000 from Mastrangelo's IOLTA Account to Mr. Bernhard Stefan Ochs via Attorney 1's bank account at Evolve Bank in Memphis, Tennessee;

(l) On or about January 17, 2023, Davies instructed Barisic to transfer $1,900,000 from Mastrangelo's IOLTA Account to Attorney 1's bank

account at Solaris SE in Berlin, Germany (henceforth, "Attorney 1's German Account").

(m)    On or about January 23, 2023, Davies instructed Barisic to transfer $1,500 to Barisic for "disbursements on behalf of PPS business via Zelle;"

(n)    On or about January 24, 2023, Davies instructed Barisic to transfer $61,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, for "disbursements and additional work;"

(o)    On or about January 26, 2023, Davies instructed Barisic to transfer $2,000,000 from Mastrangelo's IOLTA Account to Attorney 1's German Account. On information and belief, Attorney 1 is Och's agent and attorney in Germany;

(p)    On or about January 31, 2023, Davies instructed Barisic to transfer $10,000 from Mastrangelo's IOLTA Account to Davies' Cyprus Account for "consultancy expenses / February 2023 fees;"

(q)    On or about January 31, 2023, Davies instructed Barisic to transfer $10,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(r)    On or about March 9, 2023, Davies instructed Barisic to transfer $10,000 from Mastrangelo's IOLTA Account to Davies Cyprus Account;

(s)    On or about March 9, 2023, Davies instructed Barisic to transfer $6,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company

International Legal & Financial Associates, LLC, New Suffolk, New York, for "legal disbursements in favor of PPS LLC;"

(t)    On or about March 14, 2023, Davies instructed Barisic to transfer $11,000 from Mastrangelo's IOLTA Account to Barisic for "PPS business disbursements;"

(u)    On or about March 17, 2023, Davies instructed Barisic to transfer $10,000 from Mastrangelo's IOLTA Account to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, for "services;"

(v)    On or about March 17, 2023, Davies instructed Barisic to transfer $10,000 from Mastrangelo's IOLTA Account to Davies' Cyprus Account;

105.    In furtherance of the Racketeering Scheme, Barisic complied and made the aforementioned transfers.

106.    Additionally, Davies received for himself the following fund transfers from the Mastrangelo IOLTA Account to Davies' bank account at Hellenic Bank in Nicosia, Cyprus, among others, which, upon information and belief, were also made upon instructions from Davies:

(a)    On or about November 29, 2022, $10,000 for "consultancy expenses'

(b)    On or about December 8, 2022, $10,000 for "consultancy expenses;"

(c)    On or about December 21, 2022, $10,000 for "consultancy expenses;"

(d)    On or about January 4, 2023, $10,000 for "consultancy expenses;"

(e)    On or about February 27, 2023, $10,000;

(f)    On or about March 9, 2023, $10,000;

(g)    On or about March 17, 2023, $10,000;

      (h)     On or about March 22, 2023, $10,000.

107.    On information and belief, Davies accepted and used the funds sent to or for him, including receiving the benefit of funds sent to Barisic in relation to a purchase of land in Cyprus (on information and belief, where Davies resides).  Davies accordingly benefited from the Racketeering Scheme by receiving or benefiting from a total of at least $249,800 in transfers from the Mastrangelo IOLTA Account.

108.    Davies knew at the time he was requesting and accepting these transfers that they were not in accordance with the DOAs, which required all the funds provided by the Plaintiffs be transferred to a trust on behalf of that particular Plaintiff and then invested on their behalf, and that no fees or commissions were payable unless they were in accordance with the IMFPA, which was never agreed upon, and fees were only to be disseminated upon Program payments in accordance with the DOA.

109.    On or about November 9, 2022, Davies instructed Barisic to set up an offshore trust "for the client mr dirk helloer from the 2m usd deal" with the "beneficiary [being] Planet Project Solutions LLC under my sole exclusive POA."  Davies knew at the time he was setting up this trust that it was not in accordance with the Fermion DOA, which required that the offshore trust should be held on behalf of Fermion.

110.    On or about December 6, 2022, Davies emailed Barisic to request that Barisic issue a letter on the Mastrangelo Law Firm letterhead listing the "available cleared funds on the account of Planet Project Solutions LLC (PPS) of which Mr John Frederic Storaska is President."  Davies stated that this was to "assist in the work of John buying his overpriced palace."  However, the funds held in the Mastrangelo IOLTA Account belonged to Plaintiffs, not PPS, as Davies and Barisic knew.

111.    Davies knew the contents of the DOAs:

(a)     On or about November 3, 2022, Storaska sent a copy of the fully executed Fermion DOA to Davies;

(b)     The DOAs for the other Plaintiffs were materially similar to the Fermion DOA;

(c)     On or about December 14, 2022, Davies sent a draft DOA for another possible investor, which was materially identical to the DOAs PPS entered with the Plaintiffs, to Barisic, asking him to "please read carefully and call me to discuss now…."

3.      **MASTRANGELO AND THE LAW OFFICE OF DEAN MASTRANGELO, P.C.**

112.    Each of the acts of Mastrangelo set forth herein was performed on behalf of Defendant The Law Office of Dean Mastrangelo, P.C., and vice versa and Mastrangelo operated and controlled The Law Office of Dean Mastrangelo, P.C. at all material times.

113.    In addition to the acts set forth above, Defendant Mastrangelo took the following overt acts in furtherance of the Racketeering Scheme, among others:

114.    On or about June 15, 2022, Mastrangelo, on behalf of The Law Office of Dean Mastrangelo, PC, entered into a Paymaster Service Agreement set forth in paragraph 73 above.

115.    At some time prior to November 2022, Mastrangelo engaged Barisic to assist with these Paymaster services and authorized Barisic to use Mastrengelo's domain name "@mastrangelolaw.com" to transmit and receive communications to further the Racketeering Scheme.

116.    Mastrangelo was aware of the contents of the DOAs between PPS and each of the Plaintiffs respectively.  Pursuant to the Paymaster Service Agreement signed on June 15, 2022, PPS agreed to "submit a contract from where the funds were derived … for each transaction in which The

Law Office of Dean Mastrangelo, P.C. shall serve as paymaster" And Mastrangelo agreed to act as the representative of the interests of PPS as "more fully described in each contract as provided to the law Office prior to the distribution of funds." On October 31, 2023, Mastrangelo confirmed to ARX that he had a copy of the ARX DOA.

117.    In addition to the transfers set forth above, Mastrangelo made or allowed numerous interstate or international wire transfers of funds from the Mastrangelo IOLTA Account in violation of the DOAs, including the following, among others:

(a)    On or about November 14, 2022, $7,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(b)    On or about November 29, 2022, $10,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(c)    On or about December 12, 2022, $21,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(d)    On or about December 21, 2022, $10,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(e)    On or about December 28, 2022, $16,100 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(f)    On or about January 12, 2023, $10,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(g)    On or about January 20, 2023, $500,000 to Attorney 1's German Account;

(h)    On or about January 23, 2023, $500,000 to Attorney 1's German Account;

(i)      On or about January 23, 2023, $1,500 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, for "disbursements on behalf of PPS business";

(j)      On or about January 24, 2023, $61,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York, for "disbursements and additional work";

(k)      On or about January 24, 2023, $2,000,000 to Attorney 1's German Account;

(l)      On or about January 25, 2023, $50,000 to John Frederic Storaska via Agent 2, Sunny Isles Beach, Florida;

(m)      On or about January 26, 2023, $10,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(n)      On or about February 14, 2023, $5,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(o)      On or about February 27, 2023, $10,000 to John Frederic Storaska via Agent 2, Sunny Isles Beach, Florida;

(p)      On or about February 27, 2023, $10,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(q)      On or about March 22, 2023, $10,000 to Barisic via Barisic's company International Legal & Financial Associates, LLC, New Suffolk, New York;

(r)      On or about March 22, 2023, $234,749.48 to "Miami Law Counsel" for "escrow transfer for Project Planet Solutions."

118.    Mastrangelo knew that the aforementioned transfers were in breach of the DOAs.

4.    **BARISIC**

119.    Each of the acts of Defendant Barisic set forth herein was conducted on behalf of Defendant The Law Office of Dean Mastrangelo, P.C..

120.    In addition to those acts set forth above, Defendant Barisic furthered the Racketeering Scheme by numerous overt acts, including (i) in August and September 2022, working with Davies, Storaska, and third parties to design the Racketeering Scheme; (ii) exercising significant control over the Law Office of Dean Mastrangelo, P.C. in relation to the Racketeering Scheme; (iii) making or instructing Mastrangelo to make numerous transfers out of the Mastrangelo IOLTA Account to various Co-Schemers; and (iv) providing advice to PPS in relation to the Racketeering Scheme.

121.    Defendant Barisic benefited from the Racketeering Scheme in many ways, including but not limited to, receiving at least $253,280 of Plaintiffs' funds from the Mastrangelo IOLTA Account, not including the $150,000 he obtained in relation to a purchase of land in Cyprus.

122.    At the time of the transfers set forth above, Defendant Barisic knew that they breached the DOAs.

123.    Defendant Barisic knew the contents of the Plaintiffs' DOAs.  Among other things:

(a)    On or about November 3, 2022, Storaska sent Barisic a copy of the Fermion DOA.  Barisic replied to Storaska "do not sign this document before speaking to me. There is an error in it," which Barisic identified as the address for PPS being listed as Mastrangelo's law offices, which Barisic said could cause "allegations of conflict of interest … as we are supposed to be an independent third party for escrow purposes;"

(b)    On or about November 3, 2022, Storaska sent a copy of the fully executed Fermion DOA to Barisic;

(c)    The DOAs for the other Plaintiffs were materially similar to the Fermion DOA;

(d)    On or about December 15, 2022, Storaska reported to a potential investor, copying Barisic, an email he received from Barisic, in which Barisic stated that "the use of a three party escrow agreement negates the form and structure of how this business was designed;";

(e)    On or about December 20, 2022, in an email exchange with Storaska relating to the execution of a DOA with another potential investor, Barisic said "these people are trying to restructure the whole deal. It will not work that way;"

(f)    On or about December 20, 2022, Barisic emailed a potential investor as follows:

> As per your request I write to confirm the following. As stated in section 1.6 of the contract between you and our client, Planet Project Solutions, LLC. Upon receiving funds into the IOLTA account of our law firm, Planet Project Solutions, LLC then supplies us with their own funds up to an amount they deem sufficient to cover the cost of a bank guarantee or standby letter of credit to guarantee the amount of funds you have deposited. Those funds are secured and maintained in our IOLTA account for no less than 90 days. Should the business between PPS and yourself not go as planned, then the held funds are to be used to supply you with the bank instrument which when cashed out or monetized will reimburse you up to the amount of principal you have previously invested … Joseph Barisic JD, LLM, Law Office of Dean Mastrangelo, PC.

124.    On or about December 6, 2022, Davies emailed Barisic requesting Barisic to issue a letter on the Mastrangelo Law Firm letterhead listing the "available cleared funds on the account of Planet Project Solutions LLC (PPS)" and in order to "assist in the work of John buying his overpriced palace." On or about December 6, 2022, Barisic emailed a copy of the requested letter back to Davies. Barisic knew that the funds held in the Mastrangelo IOLTA Account belonged to Plaintiffs, not to PPS.

125.    On or about December 14, 2022, Barisic assisted with setting up the Levantian Embrolios Trust and Mast High Fish Nets LLC in Nevis, and appointing Storaska the protector of the trust and PPS as the sole beneficiary.

126.    On or about January 26, 2023, Fermion requested Storaska to provide "the details of the trust/off-shore SPV that was set up for [Fermion]." On or about January 31, 2023, Barisic replied to Fermion, copying Storaska, and attaching a copy of a certificate of formation for the Levantian Embrolios Trust and a certification of registration for Mast High Fish Nets LLC, but concealing that the Levantian Embrolios Trust did not have Fermion as the beneficiary, and instead had PPS as the beneficiary, and concealing that that no bank account had been set up for the Trust or the LLC, and no funds were being held by the Trust or the LLC. On information and belief, this Trust and LLC were never used for the benefit of Fermion, and Barisic and the other Defendants, along with Storaska, and other co-conspirators, concealed this fact from Fermion.

127.    On or about December 14, 2022, Barisic assisted with setting up the Ibsalon Trust and Argantrim LLC in Nevis,  with Storaska as the protector of the trust and PPS as the sole beneficiary. The trust was in turn the sole member of the LLC, and no bank account was ever set up for the trust or the LLC.

128.    On or about December 23, 2022, Storaska reported to Victim 1 that "'Ibsalon Trust' was formed in Nevis as the tax free vehicle that is used for your position." On or about January 19, 2023, Storaska forwarded this email to Barisic who knew then that the Ibsalon Trust did not have Victim 1 as the beneficiary, and had instead been set up to have PPS as the beneficiary, and that no bank account had been set up for the Ibsalon Trust or the LLC, and no funds were being held by the Trust or the LLC. On information and belief, this Trust and LLC were never used for the benefit of

Victim 1, and Barisic and the other Defendants, along with Storaska, and other co-conspirators, concealed this fact from Victim 1.

129.     In or around January through May 2023, Barisic assisted setting up several other trusts and LLCs in Nevis, with Storaska as the protector of the trust and PPS as the sole beneficiary. The respective trusts were the sole members of the associated LLCs, and no bank accounts were established for any of these trusts or LLCs.  On information and belief, none of these trusts or LLCs were ever used for the benefit of any of the Plaintiffs, but were instead established by Barisic and the other Defendants, along with Storaska, and other co-conspirators, to further the Racketeering Scheme and conceal from Plaintiffs that their funds were not in fact invested though an offshore trust.

### 5.     OCHS

130.     In addition to those acts set forth above, Defendant Ochs furthered the Racketeering Scheme by numerous overt acts, including the following.

131.     On or about January 11, 2023, Ochs entered into a Deed of Agreement with Industrias Alpha Centauri, S.A. ("Alpha Centauri"), a Panamanian company represented by John Storaska, pursuant to which Ochs was to receive not less than $1,100,000.00 and agreed to invest those funds ("Alpha Centauri DOA").

132.     At the time of entering the Alpha Centauri DOA, Ochs knew or should have known that the funds were derived from the Racketeering Scheme.

133.     As set out above, Ochs benefited from the Racketeering Scheme by receiving no less than $5,000,000 of the Plaintiffs' funds from the Mastrangelo IOLTA Account via his attorney in German, Attorney 1's German Account.  Ochs never invested those funds for the benefit of Plaintiffs or for the benefit of Alpha Centauri.

134.    Instead, upon receipt in Germany, those funds were frozen in Attorney 1's German Account.

135.    When, in 2023, Plaintiffs discovered that their funds had been transferred to Ochs in Germany, Ochs continued to further the Racketeering Scheme by refusing to communicate with Plaintiffs and their representatives, concealing relevant information regarding the funds, and making false statements to Plaintiffs and their representatives about the Scheme and the funds.

## F.    EXTENSIVE NATURE OF THE RACKETEERING SCHEME

136.    In furtherance of the Racketeering Scheme, Defendants, Storaska, and other co-conspirators attempted to defraud numerous other victims, known and unknown to Plaintiffs during the period of at least October 2021 through October 2023. From at least as early as October 2021, Defendants, Storaska, and other co-conspirators, through the Racketeering Scheme, successfully defrauded at least one additional victim to transfer funds to the Defendants, and at least two additional victims in December 2021. The transfers from these additional victims were in amounts of up to $80,000, after which the Defendants, Storaska, and other co-conspirators increased the amounts they sought to fraudulently obtain from victims. From November 2022 to July 2023, in addition to the amounts fraudulently obtained from Plaintiffs and Victim 1, the Defendants, Storaska, and other co-conspirators attempted to defraud at least 15 other potential victims of at least $2 million each, and in some cases in much greater amounts. The Defendants, Storaska, and other co-conspirators also attempted to  increase the minimum required seed investment from $2 million to $3.5 million in mid-January 2023, and then to $4 million in early February 2023.

137.    The Racketeering Scheme continued to operate to lure additional victims after the death of Storaska in July 2023 and continues to date to retain and conceal funds it has stolen and to present an ongoing threat. For example, in or around September 2023, two brokers introduced a

California victim to PPS ("California Victim"). Defendants, Storaska, and other co-conspirators, through the Racketeering Scheme, solicited this California Victim to make a $3.5 million investment using a DOA materially identical to the DOAs executed by Plaintiffs.

138.    However, after the California Victim learned of Fermion's Petition to the Supreme Court of the State of New York, New York County, Docket Number 654091/2023, which disclosed the Racketeering Scheme, the California Victim terminated further discussions with Defendants.

139.    In later 2023 and 2024 and to date, Defendant Ochs has continued to further the Racketeering Scheme and to cover it up by withholding and concealing funds transferred to Attorney 1's German Account, by concealing from Plaintiffs information about those funds, and by making false statements to Plaintiffs and their representative about the Racketeering Scheme and the funds.

140.    After September 2023, co-conspirator Agent 1 continued to withhold information from Plaintiffs and to convey false information to Plaintiffs in order to further and to conceal the Racketeering Scheme.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (RACKETEER CONSPIRACY 18 U.S.C. §§1962 AND 1964)

141.    Plaintiffs repeat the allegations of paragraphs one through 140 as if fully set forth herein.

142.    This is an action against the Defendants for a violation of 18 U.S.C. §§1962(d) and 1964.

143.    From in and about October 2021, and through the filing of this Complaint, the Defendants and co-conspirators known and unknown to Plaintiffs, who were employed by and associated with the enterprise-in-fact pleaded below (the "Enterprise") , which engaged in and affected interstate and foreign commerce, did unlawfully, willfully, and knowingly conspire to

conduct and participate, directly and indirectly, in the conduct of the enterprise through a pattern of racketeering activity, which included more than two acts indictable under Title 18, United States Code, § 1341 (wire fraud),§ 1344 (bank fraud), and §§ 1956 and 1957 (money laundering).

## I.    The Enterprise

144.    During the course of the pattern of racketeering activity, the Defendants and co-conspirators, known and unknown to Plaintiffs, joined together as a union or group of individuals, associated in fact although not a legal entity, for the common purpose of defrauding and cheating the Plaintiffs and others out of at least $2 million each.

145.    Each of the Defendants, Storaska, and other co-conspirators committed and agreed to commit or to aid and abet the commission of two or more fraudulent and illegal racketeering acts in order to acquire and maintain, directly or indirectly, an interest in and control of the Enterprise; and conducted and intended to conduct the affairs of the Enterprise through the pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1), (4), and (5), and 1962 (a), (b), and (c).

## II.    The Pattern of Racketeering Activity

146.    It was an object of the pattern of activity that the Defendants and co-conspirators, known and unknown to Plaintiffs, would and did devise schemes and artifices to defraud and for obtaining money from Plaintiffs and others and engage in the acts set forth above in violation of the criminal wire fraud statute, 18 U.S.C. § 1343, in that Defendants, Storaska, and other co-conspirators devised and intended to devise a scheme and artifice to commit multiple frauds upon, and to obtain money from Plaintiffs and others, by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing said scheme and artifice and attempting to do so, Defendants, Storaska, and other co-conspirators used and caused to be used interstate wire

communications, to wit: by causing the sending of emails and wiring of transfers of funds set forth above.

147.    It was a further object of the pattern of racketeering activity that the Defendants and co-conspirators, known and unknown to Plaintiffs, would and did engage in the acts set forth above that constitute violations of the criminal bank fraud statute, 18 U.S.C. § 1344, in that Defendants and co-conspirators, devised and intended to devise a scheme and artifice to transfer the funds set forth above with banks and to collect the proceeds thereof, which hereunder the custody and control of such bank and which belonged to Plaintiffs, as set forth above.

148.    It was a further object of the pattern of racketeering activity that the Defendants and co-conspirators, known and unknown to Plaintiffs, would and did engage in the acts set forth above that constitute violations of the criminal money laundering statute, 18 U.S.C. § 1956, in that Defendants and co-conspirators unlawfully, willfully, and knowingly committed an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, the transfers set forth herein from the Mastrangelo IOLTA Account, represented, devised and intended to devise a scheme and artifice to launder money knowing that the money derived or represented the proceeds of some form of unlawful activity, unlawfully, willfully, and knowingly, would and did in fact attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud, and bank fraud, knowing that the transactions were designed in whole or in part (a) to promote the carrying on of specified unlawful activity, in violations of Section 1956 (a) of Title 18, United States Code, (b) to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Section 1956 (a) of Title 18, United States Code.

149.     It was a further object of the pattern of racketeering activity that the Defendants and co-conspirators, known and unknown to Plaintiffs, would and did engage in the acts set forth above that constitute a violation of the criminal money laundering statute. 18 U.S.C. § 1957, in that Defendants, Storaska, and other co-conspirators in carrying out these financial transactions, in an offense involving and affecting interstate and foreign commerce, also unlawfully, willfully and knowingly engaged in money transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity.

150.     Such fraud, bank fraud, and money laundering activity constitute racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

151.     Predicated upon the violations of the above referenced federal criminal statutes, the Defendants and co-conspirators knowingly, willfully, and intentionally perpetrated a massive fraudulent scheme on Plaintiffs.

152.     The commission of these related predicate acts over the period of time alleged, with the intention and effect of defrauding Plaintiffs and others continuing to date constituted a continuous and interwoven pattern of racketeering activity as defined in 18 U.S.C. §1961(1) and (5).

153.     The Racketeering Scheme and conspiracy did not have, and was not designed with, a fixed termination date or event in mind, but among other things, was designed and executed to be continually effective over a long period.   In began no later than 2021 and continued to date and after Storaska's death.

154.     Through this conduct, Defendants and co-conspirators had a common purpose and motive for devising the Racketeering conspiracy to defraud Plaintiffs and others.

155.    Each of the acts of wire communications, bank fraud, and money laundering furthered the Racketeering Scheme to defraud, which was intended to and did proximately cause injury to Plaintiffs in their business and property.

156.    As a direct and proximate result of the conduct of the affairs of the Enterprise by Defendants and  co-conspirators through a pattern of racketeering activity, each Plaintiff has been injured in its business and property by said violations of § 1962 (b) and (c) in an amount no less than $2 million and is also entitled to recover threefold the damages sustained together with the costs of this litigation, including reasonable attorneys' fees.

157.    As a direct and proximate result of the foregoing, each Plaintiff is entitled to recover from the Defendants and Relief Defendant, jointly and severally, treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided under 18 U.S.C. § 1964(c), and Defendants and Relief Defendant should be required to divest themselves of all interests in the Enterprise, including any interests in the Defendant PPS and Defendant The Law Offices of Dean Mastrangelo, and their property and in any other entities that received any of the stolen transfers.

## SECOND CAUSE OF ACTION
### (Racketeering 18 U.S.C. §§1962(c) and 1964)

158.    Plaintiffs repeat the allegations of paragraphs one through 157 as if fully set forth herein.

159.    This is an action against the Defendants for a violation of 18 U.S.C. §§1962(c) and 1964.

160.    From in and about October 2021, and through the filing of this complaint, the Defendants, Storaska, and  other co-conspirators and others known and unknown to Plaintiffs, were employed by and associated with the Enterprise set forth above, and did unlawfully, willfully, and

knowingly conduct and participate, directly and indirectly, in the conduct of the Enterprise through a pattern of racketeering activity, set forth above.

161.    Each of the Defendants, Storaska, and other co-conspirators committed and agreed to commit or aided and abetted the commission of two or more fraudulent and illegal racketeering acts in order to acquire and maintained, directly or indirectly, an interest in and control of the Enterprise; and conducted and intended to conduct the affairs of the Enterprise through the pattern of racketeering set forth above.

162.    The commission of these related predicate acts over the period of time alleged, with the intention and effect of defrauding Plaintiffs and others continuing to date, constituted a continuous and interwoven pattern of racketeering activity as defined in 18 U.S.C. §1961(1) and (5).

163.    The Racketeering Scheme did not have, and was not designed with, a fixed termination date or event in mind, but among other things, was designed and executed to be continually effective over a long period.   In began no later than 2021 and continued to date and after Storaska's death.

164.    Through this conduct, Defendants, Storaska, and other co-conspirators had a common purpose and motive for devising the Racketeering Scheme to defraud Plaintiffs and others.

165.     Each of the acts of wire communications, bank fraud, and money laundering furthered the Racketeering Scheme to defraud, which was intended to and did proximately cause injury to Plaintiffs in their business and property.

166.    As a direct and proximate result of the conduct of the affairs of the Enterprise by Defendants, Storaska, and other co-conspirators through a pattern of racketeering activity, each Plaintiff has been injured in its business and property by said violations of § 1962 (b) and (c) in an

amount no less than $2 million and is also entitled to recover threefold the damages sustained together with the costs of this litigation, including reasonable attorneys' fees.

167.    As a direct and proximate result of the foregoing, each Plaintiff is entitled to recover from the Defendants and Relief Defendant jointly and severally treble damages, together with all costs of this action plus reasonable attorney's fees, all as provided under 18 U.S.C. § 1964(c), and Defendants and Relief Defendant should be required to divest themselves of all interests in the Enterprise, including any interests in the Defendant PPS and Defendant The Law Offices of Dean Mastrangelo, and their property and in any other entities that received any of the stolen transfers.

### THIRD CAUSE OF ACTION
### (Fraud)

168.    Plaintiffs repeat and reallege paragraphs one through 167 hereof, as if fully set forth herein.

169.    The Defendants, Storaska, and other co-conspirators made the representations and the omissions of material information set forth above to Plaintiffs intentionally and knowingly for the purpose of (i) defrauding Plaintiffs, (ii) enabling the Defendants, Storaska, and other co-conspirators to retain some share of the proceeds of the fraud, and (iii) concealing the Racketeering Scheme from Plaintiffs and others.

170.    The Defendants, Storaska, and other co-conspirators made the representations to Fermion set out in paragraphs 38 and 39 above.

171.    The Defendants, Storaska, and other co-conspirators made the representations to Caltenn set out in paragraph 49 above.

172.    The Defendants, Storaska, and other co-conspirators made the representations to ARX set out in paragraphs 55 and 56 above.

173.    The Defendants, Storaska, and other co-conspirators made the representations to Victim 1 set out in paragraph 63 above.

174.    Plaintiffs justifiably relied on Defendants', Storaska's, and other co-conspirators' misrepresentations and omissions in entering the respective DOAs, transferring their $2,000,000 each to the Mastrangelo IOLTA Account and permitting PPS to hold that investment through July 2023.

175.    As a direct and proximate result of these misrepresentations, omissions, and concealments, each Plaintiff has been injured and has suffered damages in an amount to be determined at trial, , but in no event less than $2,000,000 each, and each Plaintiff is entitled to recovery from Defendants and Relief Defendant, jointly and severally, in that amount, plus pre-judgment interest, post-judgment interest at 9%, and attorney's fees and expenses.

176.    Defendants', Storaska's,  and co-conspirators' conduct described above was in bad faith, malicious, willful, grossly negligent, reckless, wanton, fraudulent and intended to injure Plaintiffs.  The community at large is also harmed by such conduct.

177.    As a result of the foregoing and in order to deter such future conduct by Defendants and other co-conspirators and others in the community, each of the Plaintiffs is entitled to recover from each Defendant and Relief Defendant, jointly and severally, a judgment for exemplary and punitive damages in an amount to be determined at trial, but not less than $5,000,000 each.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

178.    Plaintiffs repeat and reallege paragraphs one through 177 hereof, as if fully set forth herein.

179.    Co-conspirator Storaska and Defendant Mastrangelo, and others, owed a fiduciary duty to each of the Plaintiffs, including the duty of loyalty and the duty not to misappropriate funds entrusted to PPS.

180.    Co-conspirator Storaska and Defendant Mastrangelo, and others, intentionally and knowingly breached their duty to each Plaintiff by (i) engaging in the Racketeering Scheme to steal funds belonging to each of the Plaintiffs and to convert those funds for their own personal use and/or the use of the other Defendants, Storaska, and other co-conspirators, and unknown others; and (ii) secreting and turning over the funds belonging to each Plaintiff to the control of Defendant Ochs; (iii) making false financial reports to each Plaintiff and otherwise fraudulently concealing the Racketeering Scheme from each Plaintiff.

181.    As a direct and proximate result of these breaches, each Plaintiff has been injured and has suffered damages in an amount to be determined at trial, but in no event less than $2,000,000 each, and each Plaintiff is entitled to recovery from Defendants and Relief Defendant, jointly and severally, in that amount, plus pre-judgment interest, post-judgment interest at 9%, and attorney's fees and expenses.

182.    Defendants', Storaska's, and other co-conspirators' conduct described above was in bad faith, malicious, willful, grossly negligent, reckless, wanton, fraudulent and intended to injure Plaintiffs. The community at large is also harmed by such conduct.

183.    As a result of the foregoing and in order to deter such future conduct by Defendants and other co-conspirators and others in the community, each of the Plaintiffs is entitled to recover from each Defendant and Relief Defendant, jointly and severally, a judgment for exemplary and punitive damages in an amount to be determined at trial, but not less than $5,000,000 each.

## FIFTH CAUSE OF ACTION
### (Breach of Contract)

184.    Plaintiffs repeat and reallege paragraphs one through 183 hereof, as if fully set forth herein.

185.    The Fermion DOA was a valid and binding agreement between Defendant PPS and Plaintiff Fermion.

186.    The Fermion DOA required PPS to open an offshore trust on behalf of Fermion as an investment vehicle, which account would receive, hold, and keep safe for Fermion's benefit Fermion's $2 million and any proceeds from the investment program.

187.    Fermion performed its obligations under the Fermion DOA.

188.    PPS materially breached the Fermion DOA by (i) not transferring Fermion's $2 million into an offshore trust on behalf of Fermion, and (ii) not investing Fermion's $2 million through the trust on behalf of Fermion, and by instead using Fermion's funds for its own purposes and for the benefit of it and the other Defendants, Storaska, and other co-conspirators and their affiliates.

189.    As a direct result of PPS's breach, Fermion has been damaged in an amount not less than $2 million, plus promised benefits of the Fermion DOA and the investment program, plus prejudgment interest.

190.    As a result of the foregoing, Fermion is entitled to recover from PPS a judgment in an amount no less than $2,000,000, plus promised benefits of the Fermion DOA and the investment program, plus pre-judgment and post-judgment interest at 9%.

191.    The Caltenn DOA was a valid and binding agreement between Defendant PPS and Plaintiff Caltenn.

192.    The Caltenn DOA required PPS to open an offshore trust on behalf of Caltenn as an investment vehicle, which account would receive, hold, and keep safe for Caltenn's benefit Caltenn's $2 million and any proceeds from the investment program.

193.    PPS materially breached the Caltenn DOA by (i) not transferring Caltenn's $2 million into an offshore trust on behalf of Caltenn, and (ii) not investing Caltenn's $2 million through the trust on behalf of Caltenn, and by instead using Caltenn's funds for its own purposes and for the benefit of it and the other Defendants, Storaska, and other co-conspirators and their affiliates.

194.    As a direct result of that breach, Caltenn has been damaged in an amount not less than $2 million, plus promised benefits of the Caltenn DOA and the investment program, plus prejudgment interest.

195.    As a result of the foregoing circumstances, Caltenn is entitled to recover from PPS a judgment in an amount no less than $2,000,000, plus promised benefits of the Caltenn DOA and the investment program, plus pre-judgment and post-judgment interest at 9%.

196.    The ARX DOA was a valid and binding agreement between Defendant PPS and Plaintiff ARX.

197.    The ARX DOA required PPS to open an offshore trust on behalf of ARX as an investment vehicle, which account would receive, hold, and keep safe for ARX's benefit ARX's $2 million and any proceeds from the investment program.

198.    PPS materially breached the ARX DOA by (i) not transferring ARX's $2 million into an offshore trust on behalf of ARX, and (ii) not investing ARX's $2 million through the trust on behalf of ARX, and by instead using ARX's funds for its own purposes and for the benefit of it and the other Defendants, Storaska, and other co-conspirators and their affiliates.

199. As a direct result of that breach ARX has been damaged in an amount not less than $2 million, plus promised benefits of the ARX DOA and the investment program, plus prejudgment interest.

200. As a result of the foregoing circumstances, ARX is entitled to recover from PPS a judgment in an amount no less than $2,000,000, plus promised benefits of the ARX DOA and the investment program, plus pre-judgment and post-judgment interest at 9%.

### SIXTH CAUSE OF ACTION
### (Conversion)

201. Plaintiffs repeat and reallege paragraphs one through 200 hereof, as if fully set forth herein.

202. Defendants, Storaska, and other co-conspirators, aiding and abetting each other, have intentionally exercised dominion and control over the $2 million of each Plaintiff that at all times belonged exclusively to each Plaintiff and converted those monies for their own use and benefit, without authority or justification, and in derogation of each Plaintiff's rights. This was not authorized by each Plaintiff.

203. In carrying out the acts set forth above, Defendants, Storaska, and other co-conspirators have converted each Plaintiff's property.

204. Each Plaintiff is entitled to immediate possession of its respective $2 million.

205. Defendants, Storaska, and other co-conspirators have interfered with each Plaintiff's use and possession of its $2 million investment funds and converted it to their own use and possession.

206. Defendants, Storaska, and other co-conspirators have wrongfully deprived each Plaintiff of the use and control of the $2 million, having taken dominion over those funds, inconsistent with the rights of each Plaintiff.

207.    Defendants', Storaska's, and co-conspirators' interference with each Plaintiff's use and control of the $2 million has been willful and intentional, and without lawful justification.

208.    Despite each Plaintiff's repeated demands, Defendants, Storaska, and other co-conspirators have refused to return the $2 million to each Plaintiff and have continued to exercise control and dominion over each Plaintiff's $2 million.

209.    As a direct and proximate result of the conversion described in the previous paragraphs, each Plaintiff has been injured and has suffered damages in an amount to be determined at trial, but in no event less than $2,000,000 each, and each Plaintiff is entitled to recovery from Defendants and Relief Defendant, jointly and severally, in that amount, plus pre-judgment interest, post-judgment interest at 9%, and attorney's fees and expenses.

210.    Defendants, Storaska, and other co-conspirators intentionally and knowingly breached their duty to each Plaintiff by (i) engaging in the Racketeering Scheme to steal funds belonging to each of the Plaintiffs and to convert those funds for their own personal use and/or the use of the other Defendants, Storaska, and other co-conspirators and unknown others; and (ii) secreting and turning over the funds belonging to each Plaintiff to the control of Defendant Ochs; (iii) making false financial reports to each Plaintiff and otherwise fraudulently concealing the Racketeering Scheme from each Plaintiff.

211.    Defendants', Storaska's, and other co-conspirators' conduct described above was in bad faith, malicious, willful, grossly negligent, reckless, wanton, fraudulent and intended to injure Plaintiffs. The community at large is also harmed by such conduct.

212.    As a result of the foregoing and in order to deter such future conduct by Defendants and co-conspirators and others in the community, each of the Plaintiffs is entitled to recover from

each Defendant and Relief Defendant, jointly and severally, a judgment for exemplary and punitive

damages in an amount to be determined at trial, but not less than $5,000,000 each.

### SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

213.    Plaintiffs repeat and reallege paragraphs one through 212 hereof, as if fully set forth

herein.

214.    Fermion conferred benefits upon Defendants, Storaska, and other co-conspirators by

transferring to them $2,000,000.

215.    Defendants, Storaska, and other co-conspirators have retained the benefits delivered

by Fermion without providing any benefit in return.

216.    Therefore, Defendants, Storaska, and other co-conspirators have become unjustly

enriched in the amount of $2,000,000 dollars and it would be unjust for Defendants, Storaska, and

other co-conspirators to retain the benefits of that sum without returning the money to Fermion, after

Fermion demanded the return of that sum.

217.    As a result of the foregoing circumstances, Fermion is entitled to recover from

Defendants and Relief Defendant, jointly and severally, a judgment in an amount to be shown at trial

but not less than $2,000,000, plus promised benefits of the Fermion DOA and the investment

program, plus pre-judgment interest, post-judgment interest at 9%, and attorney's fees and expenses.

218.    Caltenn conferred benefits upon Defendants, Storaska, and other co-conspirators by

transferring to them $2,000,000.

219.    Defendants, Storaska, and other co-conspirators have retained the benefits delivered

by Caltenn without providing any benefit in return.

220.    Therefore, Defendants, Storaska, and other co-conspirators have become unjustly

enriched in the amount of $2,000,000 dollars and it would be unjust for Defendants and Relief

Defendant to retain the benefits of that sum without returning the money to Caltenn, after Caltenn demanded the return of that sum.

221.    As a result of the foregoing circumstances, Caltenn is entitled to recover from Defendants and Relief Defendant, jointly and severally, a judgment in an amount to be shown at trial but not less than $2,000,000, plus promised benefits of the Caltenn DOA and the investment program, plus pre-judgment interest, post-judgment interest at 9%, and attorney's fees and expenses.

222.    ARX conferred benefits upon Defendants, Storaska, and other co-conspirators by transferring to them $2,000,000.

223.    Defendants, Storaska, and other co-conspirators have retained the benefits delivered by ARX without providing any benefit in return.

224.    Therefore, Defendants, Storaska, and other co-conspirators have become unjustly enriched in the amount of $2,000,000 dollars and it would be unjust for Defendants and Relief Defendant to retain the benefits of that sum without returning the money to ARX, after ARX demanded the return of that sum.

225.    As a result of the foregoing circumstances, ARX is entitled to recover from Defendants and Relief Defendant, jointly and severally, a judgment in an amount to be shown at trial but not less than $2,000,000, plus promised benefits of the ARX DOA and the investment program, plus pre-judgment interest, post-judgment interest at 9%, and attorney's fees and expenses.

226.    Defendants', Storaska's, and other co-conspirators' conduct described above was in bad faith, malicious, willful, grossly negligent, reckless, wanton, fraudulent and intended to injure Plaintiffs.  The community at large is also harmed by such conduct.

227.    As a result of the foregoing and in order to deter such future conduct by Defendants and other co-conspirators and others in the community, each of the Plaintiffs is entitled to recover

from each Defendant and Relief Defendant, jointly and severally, a judgment for exemplary and punitive damages in an amount to be determined at trial, but not less than $5,000,000 each.

## EIGHTH CAUSE OF ACTION
### (Constructive Trust)

228.    Plaintiffs repeat and reallege paragraphs one through 227 hereof, as if fully set forth herein.

229.    Pursuant to the DOAs, a confidential and/or fiduciary relationship existed between PPS and each of the Plaintiffs, respectively.

230.    Pursuant to the DOAs, Storaska and PPS promised to invest Plaintiffs' funds in trading programs to raise funds for each of the respective Plaintiffs.

231.    As a result of the escrow agency relationship between Plaintiffs and The Law Office of Dean Mastrangelo, P.C., a confidential and/or fiduciary relationship existed between the Law Office of Dean Mastrangelo, P.C. and each of the Plaintiffs, respectively.

232.    By way of this escrow agency relationship, The Law Office of Dean Mastrangelo, P.C. expressly or impliedly promised and agreed to keep any funds provided by Plaintiffs safe and insured and to return the funds to Plaintiffs in the future.

233.    In reliance upon these promises, Plaintiffs transferred funds to The Law Office of Dean Mastrangelo, P.C.

234.    On information and belief, these funds have been retained, used, and/or invested by Defendants, Storaska, and other co-conspirators for their own personal use or to acquire assets, and Defendants, Storaska, and other co-conspirators have been unjustly enriched by their use of such funds.

235.    As a result of the foregoing circumstances, Plaintiffs are entitled to a constructive trust over the proceeds and any properties, assets and monies representing any of Plaintiffs' funds which have been retained, diverted, or invested by Defendants, Storaska, and other co-conspirators.

## NINTH CAUSE OF ACTION
### (Attachment – The Law Office of Dean Mastrangelo, P.C., Mastrangelo, Barisic)

236.    Plaintiffs repeat and reallege paragraphs one through 235 hereof, as if fully set forth herein.

237.    Plaintiffs have each stated a claim for a money judgment and it is probable that Plaintiffs will succeed on the merits of their claims.

238.    Defendant The Law Office of Dean Mastrangelo, P.C., by its agents Mastrangelo and/or Barisic caused numerous funds transfers to leave the Mastrangelo IOLTA Account, as set out in paragraphs 93, 104, 106, and 117 above.  Notably, Barisic and/or Mastrangelo, acting as agents for The Law Office of Dean Mastrangelo, P.C., caused at least $6,989,800 of Plaintiffs' and Victim 1's money to be sent to offshore accounts or accounts outside of New York, on information and belief to parties affiliated with the Co-Schemers, in order to further and conceal the Racketeering Scheme.

239.    Barisic and/or Mastrangelo, acting as agents for The Law Office of Dean Mastrangelo, P.C., made these offshore and domestic funds transfers with the intent to defraud Plaintiffs, to whom the funds rightfully belong and/or to frustrate the enforcement of any judgment against PPS or The Law Office of Dean Mastrangelo, P.C. that might be rendered in Plaintiffs' favor.

240.    Plaintiff is not aware of any counterclaims available to Defendants.

241.    As a result of the foregoing circumstances, Plaintiffs are entitled to an order of attachment pursuant to CPLR 6201(3) against such property that is held by or for the benefit of or

subject to the control of Defendants The Law Office of Dean Mastrangelo, P.C, Mastrangelo, or Barisic, in an amount not to exceed $6,000,000 plus additional accrued interest, costs, expenses and Sheriff's fees.

## TENTH CAUSE OF ACTION
### (Attachment – PPS, Davies, Ochs, Relief Defendant)

242.    Plaintiffs repeat and reallege paragraphs one through 241 hereof, as if fully set forth herein.

243.    Plaintiffs have each stated a claim for a money judgment and it is probable that Plaintiffs will succeed on the merits of their claims.

244.    Defendants PPS, Davies, and Ochs, and Relief Defendant, are non-domiciliaries residing without the state of New York.

245.    Plaintiff is not aware of any counterclaims available to Defendants or Relief Defendant.

246.    As a result of the foregoing circumstances, Plaintiffs are entitled to an order of attachment pursuant to CPLR 6201(1) against such property that is held by or for the benefit of or subject to the control of Defendants PPS, Davies, Ochs, or Relief Defendant, in an amount not to exceed $6,000,000 plus additional accrued interest, costs, expenses and Sheriff's fees.

## ELEVENTH CAUSE OF ACTION
### (Statutory Dissolution and Court-Appointed Receiver – PPS)

247.    Plaintiffs repeat and reallege paragraphs one through 246 hereof, as if fully set forth herein.

248.    WY Stat. § 17-29-701(a)(iii) states that a limited liability company is dissolved and its activities must be wound up upon the passage of ninety consecutive days during which the company has no members.

249.    Storaska was the sole member of PPS.  Storaska died in July 2023 and, on information and belief, Storaska died without a Will and no personal representative has been appointed to his Estate.

250.    Accordingly, ninety consecutive days have passed during which PPS has had no members, and pursuant to WY Stat. § 17-29-701(a)(iii), PPS is dissolved and must be wound up.

251.    On information and belief, no person has commenced the winding up process nor has any person been appointed to do so.  Accordingly, the court should appoint a receiver to wind up the PPS's activities, including preserving any funds held or controlled by PPS, pursuant to WY Stat. § 1-33-101(a)(viii).

### TWELFTH CAUSE OF ACTION
### (Appointment of Personal Representative)

252.    Plaintiffs repeat and reallege paragraphs one through 251 hereof, as if fully set forth herein

253.     Storaska, who resided at 17700 Collins Avenue, Apt 705, Sunny Isles Beach, Florida, died on July 12, 2023.  On information and belief, Storaska died without a Will, and no personal representative has been appointed to his Estate.

254.    On information and belief, Storaska was survived by his spouse,  Betty Lou Holland Storaska.

255.    Pursuant to Fla. Stat. § 733.301(1)(b)1, in granting letters of administration in intestate estates, the surviving spouse takes first preference.

256.    Pursuant to Fla. Stat. § 733.301(3), if no application is made by any of the persons described in subsection (1) of that section, including by the surviving spouse, then a court shall appoint a capable person as personal representative.

257.    Plaintiffs request the court to appoint Betty Lou Holland Storaska, one of the Plaintiffs, or another appropriate person as the personal representative of the Estate of John Frederic Storaska.

**WHEREFORE,** Plaintiffs request judgment against the Defendants and Relief Defendant,

A.    On each of the First and Second Causes of Action, awarding each Plaintiff against each Defendant and Relief Defendant, jointly and severally, an amount of no less than $2 million in compensatory damages, and treble damages, and Defendants and Relief Defendant should be required to divest themselves of all interests in the Enterprise, including any interests in the Defendant PPS and Defendant The Law Offices of Dean Mastrangelo, and their property and in any other entities that received any of the stolen transfers;

B.    On each of the Third, Fourth, Sixth and Seventh Causes of Action, awarding to each Plaintiff against each Defendant and Relief Defendant, jointly and severally, compensatory damages in an amount to be determined at trial, but in no event less than $2,000,000;

C.    On the Fifth Cause of Action, awarding to each Plaintiff against Defendant PPS compensatory damages in an amount to be determined at trial, but in no event less than $2,000,000, plus promised benefits of the DOA and the investment program.

D.    On each of the Third, Fourth, Sixth and Seventh Causes of Action, awarding to each Plaintiff against each Defendant and Relief Defendant, jointly and severally, exemplary and punitive damages in an amount to be determined at trial, but in no event less than $5,000,000;

E.    On each cause of Action, awarding Plaintiffs prejudgment and post-judgment interest at 9%, its costs and attorneys' fees;

       F.      On the Eighth Cause of Action, granting Plaintiffs a constructive trust over the proceeds and any properties, assets and monies representing any of Plaintiffs' funds which have been retained, diverted, or invested by Defendants, Storaska, or Relief Defendant;

       G.      On the Ninth Cause of Action, making an order of attachment pursuant to CPLR 6201(3) against such property that is held by or for the benefit of or subject to the control of Defendants The Law Office of Dean Mastrangelo, P.C., Mastrangelo, or Barisic, in an amount not to exceed $6,000,000 plus additional accrued interest, costs, expenses and Sheriff's fees;

       H.      On the Tenth Cause of Action, making an order of attachment pursuant to CPLR 6201(1) against such property that is held by or for the benefit of or subject to the control of Defendants PPS, Davies, Ochs, or Relief Defendant, in an amount not to exceed $6,000,000 plus additional accrued interest, costs, expenses and Sheriff's fees;

       I.      On the Eleventh Cause of Action, appointing a receiver pursuant to WY Stat. § 1-33-101(a)(viii) to wind up the activities of PPS and to preserve any funds held or controlled by PPS;

       J.      On the Twelfth Cause of Action, appointing as the personal representative of the Estate of John Frederic Storaska either Betty Lou Holland Storaska, one of the Plaintiffs or another appropriate person.

K.      Such other relief as may be just and proper.

**Plaintiffs demand a trial by jury.**

Dated: New York, New York
       May 13, 2025

GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP

By: /s/ Michael S. Devorkin
      Michael S. Devorkin
      Kelsey J. Davis

711 3rd Avenue,
New York, New York 10017
(212) 907-7300

*Attorneys for Plaintiffs Fermion Capital Management AG, Caltenn Inc., and ARX Accurate RX Specialty Pharmacy Corp.*